Slip Op. 19-123

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DIAMOND SAWBLADES MANUFACTURERS' COALITION,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant. | Court No. 18-00134 |

## OPINION AND ORDER

[The court remands the determinations of the U.S. Department of Commerce.]

Dated: September 19, 2019

  *Daniel B. Pickard, Maureen E. Thorson, Stephanie M. Bell*, Wiley Rein LLP, of Washington, D.C., for plaintiffs.

  *John J. Tudor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director. Of counsel on the brief was *Paul K. Keith*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

  Goldberg, Senior Judge: Plaintiff Diamond Sawblades Manufacturers' Coalition ("DSMC") challenges the decision of the U.S. Department of Commerce ("Commerce") to interpret the scope of an antidumping order to exclude certain cupwheels that Lyke Industrial Tool, LLC ("Lyke") imports. DSMC moves for judgment on the agency record, arguing that Commerce's determination of what constitutes a "sawblade" and the Department's application thereof to Lyke's merchandise was not supported by substantial evidence. Pl.'s Mot. for J. on Agency R., ECF No. 16 (Nov. 28, 2018); *see also* Pl.'s Mem. in Support of its Mot. for J. on the

Agency R., ECF 16-1 (Nov. 28, 2018) ("Pl.'s Br."). Defendant United States opposes Plaintiff's motion. Def.'s Resp. to Pl.'s Mot. for J. on Agency R., ECF No. 21 (Mar. 22, 2019) ("Def.'s Br.").

Commerce's final scope determination on Lyke's cupwheels did not adhere to the regulatory framework pursuant to 19 C.F.R. § 351.225. Therefore, the court remands the final scope ruling to Commerce for further consideration in accordance with this opinion and order.

## **BACKGROUND**

In November 2009, Commerce issued an antidumping order covering diamond sawblades and parts thereof from the People's Republic of China ("China" or "PRC"). *See Diamond Sawblades and Parts Thereof From the People's Republic of China and the Republic of Korea*, 74 Fed. Reg. 57,145 (Dep't Commerce Nov. 4, 2009) (antidumping duty order) ("*Order*"). The antidumping duty order includes within its Scope:

> [A]ll finished circular sawblades, whether slotted or not, with a working part that is comprised of a diamond segment or segments, and parts thereof, regardless of specification or size, except as specifically excluded below. Within the scope of these orders are semifinished diamond sawblades, including diamond sawblade cores and diamond sawblade segments. Diamond sawblade cores are circular steel plates, whether or not attached to non-steel plates, with slots. Diamond sawblade cores are manufactured principally, but not exclusively, from alloy steel. A diamond sawblade segment consists of a mixture of diamonds (whether natural or synthetic, and regardless of the quantity of diamonds) and metal powders (including, but not limited to, iron, cobalt, nickel, tungsten carbide) that are formed together into a solid shape (from generally, but not limited to, a heating and pressing process).

*Order*, 74 Fed. Reg. at 57,145.

The Order excludes from its scope:

> Sawblades with diamonds directly attached to the core with a resin or electroplated bond, which thereby do not contain a diamond segment, are not included within the scope of the order. Diamond sawblades and/or sawblade cores with a thickness of less than 0.025 inches, or with a thickness greater than 1.1 inches, are excluded from the scope of the order. Circular steel plates that have a cutting edge of non-

> diamond material, such as external teeth that protrude from the outer diameter of the plate, whether or not finished, are excluded from the scope of the order. Diamond sawblade cores with a Rockwell C hardness of less than 25 are excluded from the scope of the order. Diamond sawblades and/or diamond segment(s) with diamonds that predominantly have a mesh size number greater than 240 (such as 250 or 260) are excluded from the scope of the order.

*Id*.

In February 2018, Lyke requested a scope ruling to determine whether two of its products, diamond sawblades and cupwheels, fell within the scope of the Order. Lyke Scope Request 2, P.R. 1 (Feb. 23, 2018). Commerce determined that Lyke's finished diamond sawblades are covered by the scope of the order, and so, only one product remains at issue today: Lyke's cupwheels. Final Scope Determination for Scope Request from Lyke Industrial Tool, LLC 8, P.R. 23 (May 17, 2018) ("Final Scope Ruling"). In the scope ruling request, Lyke requested that the agency find that cupwheels are not diamond sawblades and should be excluded from the antidumping duty order. Lyke Scope Request 2. Lyke noted that in-scope diamond sawblades have the following characteristics: (1) they must contain circular plates; (2) diamond segments must be installed on the outer periphery of the core; and (3) the sawblades must be used to cut materials. *Id.* at 11. According to Lyke, its cupwheels did not satisfy these requirements. First, while the diamond segments in diamond sawblades "are [] installed in the outer diameter (periphery) of the cores," the diamond segments in a Lyke cupwheel are "installed on the flat surface of the cores." *Id*. at 10. Additionally, "[a] cupwheel does not cut through the materials on which it is working," and instead works to "polish or clean the surface." *Id*. Therefore, Lyke argued, the cupwheels do not satisfy the requirements of an in-scope diamond sawblade and fall outside of the scope of the Order. *Id*.

Thereafter, Commerce requested additional information from Lyke concerning its scope ruling request and Lyke responded by way of a revised scope ruling request. Lyke Industrial

Supplemental Questionnaire, P.R. 11 (Mar. 22, 2018); Revised Scope Ruling Request, P.R. 13 (Apr. 3, 2018). Specifically, Lyke stated in its supplemental questionnaire response that Lyke's cupwheels are not grinding wheels because "the steel core spins parallel rather than perpendicular to the material being cut; therefore there is no rubbing." Revised Scope Ruling Request 15. After a subsequent exchange of comments and rebuttal comments from DSMC and Lyke, respectively, Commerce issued its scope determination.

In its final scope ruling, Commerce concluded that Lyke's cupwheels fall outside of the scope of the Order based primarily on their use and their physical characteristics. *See* Final Scope Ruling. At the outset, Commere "clarified that, for the scope of the investigation, diamond segments [of the merchandise] must be attached to the outer periphery of the core to be within the scope." *Id*. at 9. As to the product, Commerce first explained that "Lyke's cupwheels have diamond segments attached to the bottoms of the cores, not the outer periphery." *Id*. Second, because the cupwheels "are designed to rotate parallel, rather than perpendicular, . . . to the plane of the material," "Lyke's cupwheels, in contrast to diamond sawblades . . . , do not have an 'attacking edge' to 'penetrate the material.'" *Id*. at 10. Commerce recognized that "while the scope language does not describe in-scope merchandise . . . by their cutting function, grinding function, or spin direction, statements from the petitioner and the ITC in the investigation stage . . . clarify that a product that does not have an attacking edge that penetrates the material is not subject merchandise." *Id*. Therefore, Commerce concluded that "[a]lthough the scope language covers diamond sawblades regardless of specification," because Lyke's cupwheels are "physically distinguishable from diamond sawblades," they are not covered by the Order. *Id*. at 9–10.

DSMC moved for judgment on the agency record, arguing that Commerce's finding that Lyke's cupwheels are out of scope was not supported by substantial evidence, and that Commerce's failure to obtain sufficient information regarding Lyke's cupwheels renders its determination unsupported by substantial evidence. *See generally* Pl.'s Br.

## JURISDICTION

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and will sustain Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

"Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty orders." *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (citing *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005)). "This broad deference is not unlimited, however, since 'Commerce cannot interpret an antidumping duty order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms.'" *Id.* (quoting *Walgreen Co. v. United States*, 620 F.3d 1350, 1354 (Fed. Cir. 2010)). "Substantial evidence requires 'more than a mere scintilla,' but is satisfied by 'something less than the weight of the evidence.'" *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (citations omitted). Commerce's consideration should reflect a sound decision-making process, *see Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962), taking into account all evidence on the record, including that which may detract from the ultimate conclusion, *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). But, whatever the result, the agency's rationale must not be arbitrary, capricious, or an abuse of discretion. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).

**DISCUSSION**

The court remands Commerce's scope ruling. Although the text of the scope order is "susceptible to interpretation," *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017) (citing *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013)), the evidentiary record as relied upon by Commerce does not support its conclusion that Lyke's cupwheels fall outside the scope of the antidumping order. Additionally, the Department misapplied the regulatory framework in its analysis when it considered function and ultimate use of Lyke's cupwheels in its 19 C.F.R. § 351.225(k)(1) analysis. As such, Commerce's scope ruling is unsupported by substantial evidence.

Because descriptions of the subject merchandise must be written in general terms, "it is often difficult to determine whether a particular product is included within the scope of an antidumping or countervailing duty order." *OTR Wheel Eng'g, Inc. v. United States*, 36 CIT 988, 992, 853 F. Supp. 2d 1281, 1285 (2012) (citing 19 C.F.R. § 351.225(a)). Therefore, after an antidumping duty order is published, importers can request that Commerce clarify the scope of the order. *See* 19 C.F.R. § 351.225(a), (c). Although "no specific statutory provision govern[s] the interpretation of the scope of antidumping or countervailing orders," *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015), any scope ruling must begin by reading the language of the order itself, *Tak Fat Trading*, 396 F.3d at 1382. "Commerce's inquiry must begin with the order's scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation." *Meridian Prods., LLC*, 851 F.3d at 1381. If the order is unambiguous, its terms govern. *Id.* But in interpreting the plain language of a duty order— "whether a particular product is included within the scope of an order," 19 C.F.R. § 351.225(k)—Commerce must examine "[t]he descriptions of the merchandise contained in the

petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). These materials are called the "(k)(1)" factors. If these factors are dispositive—that is, they clarify the scope of the order—Commerce's inquiry ends there, and Commerce can issue a final ruling. *Tak Fat Trading Co.*, 396 F.3d at 1382. If not, the Department may consider the following additional criteria, called the "(k)(2)" factors: "(i) The physical characteristics of the product; (ii) The expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The channels of trade in which the product is sold; and (v) The manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2)(i)−(v).

Because the scope does not define "sawblade," Commerce appropriately looked to the sources identified in its scope regulations at 19 C.F.R. § 351.225(k)(1) (the (k)(1) factors) for guidance in interpreting the scope. However, the agency did not come to a reasonable conclusion in consideration of the entire administrative record and its findings pursuant to the (k)(1) factors did not "definitively answer the scope question." *Meridian Prods., LLC*, 851 F.3d at 1382 n.8. As a result, the court remands the Department's determination.

    **I.**    **The Text of the Scope Order Does Not Resolve the Scope Dispute**

In interpreting the scope of an order, the language therein is paramount. *Mitsubishi Polyester Film, Inc. v. United States*, 41 CIT __, __, 228 F. Supp. 3d 1359, 1371 (2017). Therefore, our inquiry begins by determining if the terms of the scope order are clear on its face. *See Mid Continent Nail Corp.*, 725 F.3d at 1302 (explaining that the inquiry begins with "the language of the final order" and turns to other sources when the "literal terms of the order" do not clarify the dispute). If the scope is unambiguous, it governs. *ArcelorMittal Stainless Belg. N.V. v. United States,* 694 F.3d 82, 87 (Fed. Cir. 2012). "The relevant scope terms are

'unambiguous' if they have 'a single clearly defined or stated meaning.'" *Atkore Steel Components, Inc. v. United States*, 42 CIT __, __, 313 F. Supp. 3d 1374, 1380 (2018) (citing *Meridian Prods., LLC*, 851 F.3d at 1385). *See also Laminated Woven Sacks Comm. v. United States*, 34 CIT 906, 914, 716 F. Supp. 2d 1316, 1325 (2010) ("Commerce need only meet a low threshold to show that it justifiably found an ambiguity in scope language.").

And so the court turns first to the plain language of the antidumping duty order. The Department found that the scope language was ambiguous as to the definition of the term "sawblade." The court agrees. The Order defines both "diamond sawblade cores" ("circular steel plates, whether or not attached to non-steel plates, with slots") and "diamond sawblade segments" ("a mixture of diamonds and metal powders that are formed together into a solid shape"), Final Scope Ruling 2, but notably omits what constitutes a "sawblade" in the first place. There is nothing in the record to suggest that the term "sawblade" has a single meaning, and so, the plain language of the Order does not resolve the scope request. *See Maquilacero S.A. de C.V. v. United States*, 41 CIT __, __, 256 F. Supp. 3d 1294, 1307 (2017) (where there is "nothing to suggest that [a term] has a single definition" and the term is "not defined in the Order," Commerce's finding of ambiguity is in accordance with law). *See also TMB 440AE, Inc. v. United States*, Slip Op. 19-109, 2019 WL 3800207, at *5 (CIT Aug. 13, 2019) (requiring analysis of (k)(1) sources "because [a term] is undefined" in the order).

Therefore, relying solely on the scope language does not compel "a single clearly defined or stated meaning" of a sawblade. *Atkore Steel Components, Inc.*, 42 CIT at __, 313 F. Supp. 3d at 1380 (citations omitted). Without a "single clearly defined or stated meaning" evident from the text of the scope order, the Order's scope is "susceptible to interpretation" "with the aid of other sources as described by regulation." *Meridian Prods., LLC*, 851 F.3d at 1381−82 (internal

quotations omitted).  Specifically, Commerce must consider "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1).

> II. **Commerce's Determination Under 19 C.F.R. § 351.225(k)(1) That Lyke's Cupwheels Fall Outside of the Scope Order is Not Supported by Substantial Evidence**

The court's inquiry continues beyond the text of the Order.  Here, Commerce sought to clarify the scope of the order and its application to Lyke's cupwheels under 19 C.F.R. § 351.225(k)(1) by examining the petition and the antidumping investigation record.  Specifically, the "(k)(1)" analysis prompts the Department to review "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce] (including prior scope determinations) and the [International Trade] Commission." 19 C.F.R. § 351.225(k)(1).  If these sources are sufficient to determine whether the product falls within the scope of the order, the court will sustain the final scope ruling.  *Tak Fat Trading*, 396 F.3d at 1382.  Although a party's description of merchandise in these sources may aid Commerce in making its determination, that description "cannot substitute for language in the order itself" because "[i]t is the responsibility of [Commerce], not those who [participated in] the proceedings, to determine the scope of the final orders." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002). Commerce's analysis of these sources against the product in question produces factual findings reviewed for substantial evidence.  *See Fedmet Res. Corp. v. United States*, 755 F.3d 912, 919–22 (Fed. Cir. 2014).  The court grants Commerce "substantial deference" with regard to its interpretation of its own antidumping duty and countervailing duty orders, *King Supply Co.*, 674 F.3d at 1348; but "Commerce cannot interpret an antidumping

order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms," *Ethan Allen Operations, Inc. v. United States*, 39 CIT __, __, 121 F. Supp. 3d 1342, 1348 (2015) (internal quotations omitted).

In its analysis, the Department intrinsically intertwined the functionality of a diamond sawblade (or "the ultimate use of the product," a (k)(2) factor) with the scope order's description of the product (a (k)(1) factor). Simply put, Commerce has failed to demonstrate that Lyke's cupwheels are not within the scope of the order based *solely* on the three sources available under 19 C.F.R. § 351.225(k)(1): the description of the merchandise contained in the petition; the initial investigation; and prior determinations of Commerce and the International Trade Commission ("ITC"). Based on those materials alone, the court does not find the factors dispositive—that is, they do not clarify the scope of the order as it relates to Lyke's cupwheels. Therefore, on remand, Commerce is ordered to conduct a (k)(2) analysis, wherein it may then appropriately consider evidence as it relates to a diamond sawblade's ultimate use.

        a. **The (k)(1) materials Commerce relied upon do not "definitively answer the scope question"**

Commerce examined the (k)(1) sources to determine if they sufficiently resolved the scope dispute as applied to Lyke's cupwheels. Ultimately, because Commerce impermissibly relied on (k)(2) materials in its (k)(1) analysis, Commerce's final scope determination is not adequately supported by the record evidence. Therefore, the court remands the Department's determination in accordance with this opinion.

In determining whether Lyke's cupwheels are in-scope merchandise, Commerce considered "the description of the merchandise contained in the investigation," as well as prior scope rulings that involved similar merchandise. Final Scope Ruling 9. According to Commerce, a review of these materials lead to its conclusion that all in-scope merchandise must

have "diamond segments . . . attached to the outer periphery of the core." *Id*. Specifically, Commerce stated that it considered prior scope rulings on merchandise with diamond grinding segments at "the outer edge of the core," as compared to Lyke's cupwheels, which "have diamond segments attached to the bottoms of the cores." *Id*. Commerce also relied on an ITC decision that analyzed a "segment, or rim, [that was] slightly wider than the core to permit the leading edge to penetrate the material without the core rubbing against it," as compared to Lyke's cupwheels, which lack such a "leading edge to penetrate [] material[s]." *Id*. And finally, Commerce reviewed the descriptions of the merchandise as discussed in the petition, as well as evidence derived from the underlying investigation, in order to make its determination that Lyke's cupwheels are not covered by the scope of the order. However, for each of these (purportedly) (k)(1) materials, Commerce relies on one fundamental—and currently unsupported—finding: that the physical characteristics of a sawblade *must* allow for an "attacking edge" that can "penetrate [] materials," *id.* at 10, such as "tile, porcelain, granite, stone, and glass," *id*. at 9. Not only is this finding—that diamond segments must be attached to the outer periphery in order to create an "attacking edge"—currently unsupported by the record evidence, it is also a factor that more squarely falls under a (k)(2) analysis. That is, *only* when the (k)(1) sources fail to clarify the scope of the order can Commerce consider additional materials, such as the physical characteristics of the product and its ultimate use. 19 C.F.R. § 351.225(k)(2)(i)–(v). Otherwise, "purpose or use cannot be the test when conducting a § 351.225(k)(1) determination." *Toys "R" Us, Inc. v. United States*, 32 CIT 814, 819, 2008 WL 2764982 at *4 (2008).

Starting with Commerce's analysis of "the description of the merchandise contained in the investigation," 19 C.F.R. § 351.225(k)(1), the Department concludes—without drawing any

logical inferences from the available evidence—that "diamond segments must be attached to the outer periphery of the core to be within the scope." Final Scope Ruling 10. This is because, as Commerce further explains, the location of the diamond segments as "attached to the outer periphery" creates an "'attacking edge' that 'penetrates the material.'" *Id*. This determination falls dangerously close to "stray[ing] beyond the limits of [the scope's] interpretation and into the realm of amendment." *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995). While the court "afford[s] significant deference to Commerce's own interpretation of its orders," *Fedmet Res. Corp.*, 755 F.3d 912, 918, Commerce cannot "impose[] a requirement not contained in the Order," *Maquilacero S.A. de C.V.*, 256 F. Supp. 3d at 1310, as it does here. Here, the scope language lists that it covers "all finished circular sawblades . . . with a working part that is comprised of a diamond segment . . . *regardless of specification or size*." *Order*, 74 Fed. Reg. at 57,145. By imputing a location requirement on the diamond segment, the Department is inherently amending the Order to, indeed, *include a specification*. The only limitation from the Order that even mentions the sawblades' attachment to the core excludes only those "sawblades with diamonds directly attached to the core *with a resin or electroplated bond*." *Id*. The Order's written exclusions provide no additional insight: the Order excludes sawblade with certain thickness specifications; steel plates with non-diamond cutting edge material; and diamond sawblades of a specified level of hardness and diamond mesh size numbers. *Id*. The Order notably does not mention diamond segment placement or the purpose of such placement. Nor does the Department explain how ambiguity as to the location of the diamond segment leads to its conclusion (or, "clarification," Final Scope Ruling 9) that the segments must be attached to the outer periphery of the core to be within the scope. But because the scope language is the "cornerstone" of any scope determination, Commerce is bound by "the

general requirement of defining the scope of antidumping and countervailing duty orders by the actual language of the orders." *Duferco Steel*, 296 F.3d at 1097. Here, Commerce went beyond the limits of its discretion when it created additional requirements beyond those prescribed by the language of the Order. *See also Maquilacero S.A.*, 256 F. Supp. 3d at 1311 (remanding where Commerce added an additional "stenciling" requirement to a final scope order that did not mention such a specification).

The prior scope determinations made by Commerce and the ITC do not provide additional support for the Department's reasoning. Commerce states that "statements from the petitioner and the ITC in the investigation stage . . . clarify that a product that does not have an attacking edge that penetrates the material is not subject merchandise." Final Scope Ruling 10. There are two issues with that determination. First, the Department's prior scope determination for *one* product's grinding wheels does not adequately address why the segment placement on the outer periphery of the sawblade is required for *all* in-scope merchandise. Moreover, the Department misapplied the regulatory framework when it inappropriately relied on (k)(2) evidence—that is, the function and use of a diamond sawblade—in its (k)(1) analysis.

In considering prior scope rulings, Commerce explained that Lyke's cupwheels differed from 1A1R grinding wheels produced by Ehwa Diamond Industrial Company ("Ehwa"), which Commerce had previously concluded fell within the scope of the Diamond Sawblades Order. Final Scope Ruling 9. According to Commerce, the Department "included Ehwa's 1A1R grinding wheels within the scope because . . . [they] have a grinding segment made of metal powders and diamonds attached to the outer edge of the core, and thus, meet the physical description of the subject merchandise." *Id.* This prior scope determination, and its findings therein, allegedly support Commerce's determination that if a product "does not have an

attacking edge that penetrates the material"—like Lyke's cupwheels—that product "is not subject merchandise." *Id*. at 10.

But neither the investigation nor the Ehwa prior scope determination demonstrably support this finding. To start, the investigatory scope memo from Ehwa's scope request mentions diamond segment placement on the outer edge of the core only *twice*—and both references were from Ehwa's *own* description of its products. *See* Consideration of Scope Exclusion and Clarification Request, P.R. 16, Attach. 1, Ex. 5 (Dec. 20, 2005) ("Ehwa Investigatory Scope Memo") ("Ehwa's own description of grinding wheels demonstrates that such products should be covered by the scope of the investigation, *e.g.*, circular wheel, diamond cutting element on the outer diameter, *etc*."). The Department made no further reference to segment placement as a (now) fundamental aspect of an in-scope sawblade[1]. But "[a]lthough a party's [own] description of merchandise . . . may aid Commerce in making its determination, that description 'cannot substitute for language in the order itself[.]'" *Duferco*, 296 F.3d at 1097. And importantly, Commerce spent a significant portion of the Ehwa scope memo explaining that the scope's language, "diamond segment or segments . . . *regardless of specification*," means just that: the scope covers products that meet certain physical characteristics specified in the text of

---

[1] The only additional evidence that the Government points to is a portion of the Lyke Final Scope Ruling, where Commerce "clarifi[es] that, for the scope of the investigation, diamond segments must be attached to the outer periphery of the core to be within the scope," citing to the 2006 Final Determination of Sales at Less Than Fair Value. *See* Final Scope Ruling 9 (citing *Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303 (Dep't Commerce May 22, 2006) (final determ. of sales at less than fair value), and accompanying Issues and Decision Memorandum at cmt. 3 ("*2006 Final Determination*")). The 2006 Final Determination contains one sentence that states "diamond segments must be attached to the outer periphery of the core." 2006 Final Determination at cmt. 3. The Department did not provide any further explanation for this requirement then, nor does it do so today. Therefore, although that is (k)(1) evidence that Commerce *may* rely on, it fails to carry the day and Commerce still falls short of the substantial evidence standard required under our review.

the order, "*irrespective of end-use*" or function of the subject merchandise.  *See* Ehwa Investigatory Scope Memo 5 (rejecting Ehwa's argument that the term "sawblades" should refer only to those blades that are used on saws in order to avoid using "end-use" characteristics in the scope determination).  This is in direct contrast to the Department's focus in the Lyke investigation: a sawblades' ability to functionally "penetrate [] material[s]" with its "attacking edge."  Final Scope Ruling 10.  Therefore, the Department's heavy reliance on the Ehwa prior scope determination fails to support the Department's conclusion that the diamond segments *must* be attached to the outer edge of the core.  Indeed, this, too, is a logical fallacy: the fact that *one* in-scope product had a certain additional characteristic (diamond segments on the outer core) does not necessarily require that *all* subject merchandise have that same additional characteristic.  Compounded by the fact that the Ehwa scope memo does not even *address* diamond segments on the outer core as a (fundamental or otherwise) element of an in-scope product, the Department has little to support its determination that Lyke's cupwheels are out of scope based solely on the product's diamond segment placement or ultimate use.

> **b. Commerce's final scope determination under 19 C.F.R. § 351.225(k)(1) was not confined to the (k)(1) sources.**

Commerce's final scope determination failed to adhere to the regulatory framework pursuant to 19 C.F.R. § 351.225.  Specifically, the Department's reasoning improperly analyzes (k)(2) evidence—ultimate use and function of the product—despite Commerce's determination that that the (k)(1) factors were dispositive and contained sufficient information to determine whether Lyke's cupwheels should be subject to the Order.  In interpreting the plain language of a duty order, the Department is limited to considering "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determination of the Secretary . . . and the Commission."  19 C.F.R. § 351.225(k)(1).  It is only when the (k)(1) sources are not

dispositive that Commerce may consider additional (k)(2) factors, which include the "physical characteristics of the product," the "expectations of the ultimate purchasers," the "ultimate use of the product," the "channels of trade in which the product is sold," and the "manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2). Therefore, where, as here, the Department finds that the (k)(1) sources "definitively answer the scope question," *Meridian Prods., LLC*, 851 F.3d at 1382 n.8, the (k)(2) factors "cannot be the test when conducting a § 351.225(k)(1) determination," *Toys "R" Us, Inc.*, 32 CIT at 819, 2008 WL 2764982 at *4.

The Department made its final scope determination pursuant to the criteria under 19 C.F.R. § 351.225(k)(1) when it found that Lyke's finished diamond sawblades are outside the scope of the Order. However, the reasoning underlying the Department's determination is fixated on whether or not Lyke's cupwheels are functionally capable of "penetrat[ing] . . . materials," which "include, among others, tile, porcelain, granite, stone, and glass." Final Scope Ruling 9. A product's function, or "ultimate use of the product," is explicitly a (k)(2) factor and has no place in a (k)(1) analysis, as was purportedly undertaken here. *See* 19 C.F.R. § 351.225(k)(2)(iii) ("When the above criteria are not dispositive, the Secretary will further consider . . . .the ultimate use of the product."). *See also Toys "R" Us, Inc.*, 32 CIT at 819 ("[P]urpose or use cannot be the test when conducting a § 351.225(k)(1) determination . . . they are factors relevant only to a § 351.225(k)(2) inquiry[.]"). The focus on the product's use as a penetrating source is evident throughout the determination: "Lyke's cupwheels are not suitable for penetrating [] material," Final Scope Ruling 10; "a product that does not have an attacking edge that penetrates the material is not subject merchandise," *id.*; "[t]he segment . . . is slightly wider than the core to permit the leading edge to penetrate the material . . . ," *id.* at 9. The Department concedes that "the scope language does not describe in-scope merchandise and

non-subject merchandise by their cutting function, grinding function, or spin direction," but in the same breath explains "that a product that does not have an attacking edge that penetrate the material is not subject merchandise." *Id.* at 10. Evidence relating to the product's function or use requires an inquiry under § 351.225(k)(2)—which the Department alleges it did not need to undergo. What's more, in the prior scope ruling for Ehwa's products—which Commerce relies upon in this investigation—the Department made clear that it would *not* make its scope determination based on end-use or function of the item. *See* Ehwa Investigatory Scope Memo 5 ("[T]he Department's decision on whether to exclude an item from the scope of an investigation or order is typically not based upon the claimed end-use of the item."). And here, Commerce based its determination almost *entirely* on the product's function, use, and physical characteristics—all additional sources outlined in 19 C.F.R. § 351.225(k)(2). Therefore, it seems quite unlikely that Commerce can confine itself to a limited § 351.225(k)(1) analysis here and reach a supported conclusion about whether Lyke's cupwheels are designed for "penetrating [] material[s]." Final Scope Ruling 10.

Moreover, the Government also relies on the 1A1R specification as listed in the Order ("the term sawblade is defined as those products that meet the 1A1R specification," *Order*, 74 Fed. Reg. at 57,146) by way of demonstrating that the in-scope products must have "grinding wheels" with grinding segments "attached to the outer edge of the core," Final Scope Ruling 9. The Department specifies that 1A1R products have a "segment thickness [that] is larger than the thickness of the core." *Order*, 74 Fed. Reg. at 57,146. That is yet another (k)(2) factor ("[t]he physical characteristics of the product," 19 C.F.R. § 351.225(k)(2)(i)) that the Department inappropriately relies upon in its (k)(1) analysis. But even putting that aside, Department attempts to draw a conclusion about the *use* of the in-scope sawblade ("grinding" or

"penetrating") from the 1A1R physical characteristic ("segment thickness [that] is larger than the thickness of the core," *Order*, 74 Fed. Reg. at 57,146). But then it is unclear to the court why the Department also stated that "[it] do[es] not need information on . . . the thickness of segments attached to cores of Lyke's cupwheels," Final Scope Ruling 10, when that is one of the few physical characteristics available for determining whether a product is in-scope. This brings the court to the next logical question: *are the segments attached to the cores of Lyke's cupwheels thicker than the thickness of the core?* To the confusion of the court, the Department notably refused to answer this relevant question in its analysis.

What is clear to the court, however, is that the criteria under 19 C.F.R. § 351.225(k)(1) is not dispositive for a scope inquiry and a determination pursuant to § 351.225(k)(2) is warranted. *See Legacy Classic Furniture, Inc. v. United States*, 35 CIT 1754, 1755, 807 F. Supp. 2d 1353, 1356 (2011) ("Only when these so-called '(k)(1)' sources are not dispositive is Commerce to proceed to consider the '(k)(2)' factors[.]"). Although the court expresses no inclination as to the correct outcome, Commerce must still explain how its findings were "reached by 'reasoned decision-making,' including . . . a reasoned explanation supported by a stated connection between the facts and the choice made," *Elec. Consumers Res. Council v. Fed. Energy Regulatory Comm'n*, 747 F.2d 1511, 1513 (D.C. Cir. 1984) (citing *Burlington Truck Lines*, 371 U.S. at 168)—even if that means delving into a (k)(2) inquiry. Therefore, the court orders the Department to proceed with a full inquiry using the factors enumerated in § 351.225(k)(2).

## **CONCLUSION AND ORDER**

The sources used by Commerce in its (k)(1) analysis do not "definitively answer" the question of whether Lyke's cupwheels are excluded from the scope of the Order. As demonstrated by the record, there are questions left unanswered that require a more reaching

analysis under 19 C.F.R. § 351.225(k)(2).  Therefore, it is necessary for Commerce to further address whether the subject merchandise falls within the scope of the order using the factors enumerated in § 351.225(k)(2).

  For the foregoing reasons, after careful review of all papers, it is hereby

  **ORDERED** that because the Department's determination under 19 C.F.R. § 351.225(k)(1) did not definitively answer the scope question, Commerce must proceed to conduct a full inquiry under 19 C.F.R. § 351.225(k)(2); and it is further

  **ORDERED** that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff shall have thirty (30) days from the filing of the redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiff's comments to file comments.

Dated: September 19, 2019
New York, New York

                */s/ Richard W. Goldberg*
                Richard W. Goldberg
                Senior Judge