Slip Op. 21-137

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **DIAMOND SAWBLADES MANUFACTURERS' COALITION,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant. | **Before: Richard Goldberg**<br><br>**Court No. 18-00134** |

## OPINION

[Sustaining the U.S. Department of Commerce's scope determination in the antidumping duty order covering diamond sawblades and parts thereof from the People's Republic of China]

Dated:  October 7, 2021

*Daniel B. Pickard* Wiley Rein LLP, of Washington D.C., for plaintiff.  With him on brief were *Maureen E. Thorson* and *Stephanie M. Bell*.

*John J. Tudor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., for defendant.  With him on the brief were *Jeanne E. Davidson*, Director and *Franklin E. White, Jr.*, Assistant Director.  Of Counsel on the brief was *Paul K. Keith*, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington D.C.

Goldberg, Senior Judge:  Before the court is the scope redetermination ("Remand Redetermination") of the U.S. Department of Commerce ("Commerce," or the "Department") filed pursuant to the court's opinion and order in *Diamond Sawblades Mfrs. Coalition v. United States*, 43 CIT __, 405 F. Supp. 3d 1345 (2019) ("*Diamond*

*Sawblades I*").  Final Results of Remand Redetermination (Feb. 3, 2020), Rem. P.R. Doc.

15,[1] ECF No. 30 ("*Remand Redetermination*").  This litigation involves a challenge to the

final scope ruling of Commerce which excludes Lyke Industrial Tools LLC ("Lyke")

cupwheels from an antidumping duty order (the "Order") on diamond sawblades from

the People's Republic of China ("China" or "PRC").  *Diamond Sawblades and Parts Thereof*

*From the People's Republic of China and the Republic of Korea: Antidumping Duty Orders*, 74

Fed. Reg. 57,145 (Int'l Trade Admin. Nov. 4, 2009) ("*Order*").

Plaintiff Diamond Sawblades Manufacturers' Coalition ("DSMC"), an *ad hoc*

coalition of producers of diamond sawblades domestic like products in the United

States, once again challenges the Department's determination that the scope of the

Order excludes certain cupwheels that Lyke imports into the United States.  For the

reasons stated herein, the court holds that the Departments' scope determination

adheres to the applicable regulatory framework of 19 C.F.R. § 351.225[2] and that there is

substantial evidence supporting Commerce's conclusion that Lyke's cupwheels are not

---

[1] All citations to documents from the administrative record are to public documents.  References cited as "P.R. Doc. __" are to documents on the original agency record; references cited as "Rem. P.R. Doc. __" are to documents placed on the record during the Department's redetermination proceeding.

[2] All citations to the United States Code herein are to the 2012 edition, except where otherwise indicated.  Citations to the Code of Federal Regulations are to the 2020 edition unless otherwise noted.

within the scope of the Order.  Therefore, Commerce's Remand Redetermination is

affirmed.

### I.  Background

The court assumes familiarity with the facts as discussed in the prior opinion.

*Diamond Sawblades I*, 43 CIT at __, 405 F. Supp. 3d at 1349–51.  Commerce issued the

antidumping duty order relevant to this litigation in November 2009, pursuant to a

petition filed by DSMC.  *Order*, 74 Fed. Reg. at 57,145; *see also* Compl. ¶ 5 (July 10, 2018),

ECF No. 9 ("Compl.").  Lyke submitted a scope ruling request to Commerce on

February 23, 2018, requesting that Commerce determine whether two of its products,

diamond sawblades and cupwheels, fell within the scope of the order.  *Letter from*

*Pennington, P.A. to Sec'y of Commerce, re: Lyke Industrial Tools, LLC Scope Request: Diamond*

*Sawblades Whose Cores Have Rockwell* C *Hardness Less Than* 25 *Prior to the Incorporation of*

*Diamond Segments and Diamond Cupwheels - Diamond Sawblades and Parts Thereof from the*

*People's Republic of China (A-570-900)* 2 (Feb. 23, 2018), P.R. Doc. 1 ("Lyke Scope

Request").  Commerce determined that Lyke's diamond sawblades are within the scope

of the Order and that its cupwheels are not.  Final Scope Determination for Scope

Request from Lyke Industrial Tool, LLC 8–10 (May 17, 2018), P.R. Doc. 23 ("Final Scope

Ruling").

On June 11, 2018, DSMC initiated litigation contesting the Department's

determination that Lyke's cupwheels are outside the scope of the Order.  Summons

(June 11, 2018), ECF No. 1; Compl. 1.  On November 28, 2018, DSMC moved for

judgment on the agency record.  Pl.'s Rule 56.2 Mot. for J. on the Agency R. (Nov. 28,

2018), ECF No. 16.  In *Diamond Sawblades I,* the court remanded the Department's Final

Scope Ruling.  First, the court found that the text of the scope of the Order did not

resolve the scope dispute in and of itself because the term "sawblade" was not clearly

defined.  *Diamond Sawblades I*, 43 CIT at __, 405 F. Supp. 3d at 1352.  Second, the court

stated that as the scope was susceptible to interpretation, Commerce needed to turn to

sources listed in 19 C.F.R. § 351.225(k)(1), which Commerce failed to do in a way that

was supported by substantial evidence because the Department's (k)(1) analysis

improperly considered criteria found under 19 C.F.R. § 351.225(k)(2).  *Id*. at __, 405

F. Supp. 3d at 1353–54.  Third, the court held that "[t]he sources used by Commerce in

its (k)(1) analysis do not 'definitively answer' the question of whether Lyke's cupwheels

are excluded from the scope of the Order."  *Id*. at __, 405 F. Supp. 3d at 1358.  The court

ordered Commerce to conduct an analysis under 19 C.F.R. § 351.225(k)(2) to determine

whether Lyke's cupwheels are included in the scope of the Order.  *Id*. at __, 405

F. Supp. 3d at 1358.

On October 15, 2019, Commerce invited both DSMC and Lyke to provide further

information related to the factors listed in 19 C.F.R. § 351.225(k)(2) and parties

commented and submitted rebuttal comments on October 24, 2019 and October 31,

2019. *Mem. from Minoo Hatten, Program Manager, AD/CVD Operations, Off. I to Diamond*

*Sawblades Mfrs. Coal. and Lyke Indus. Tools, LLC* (Oct. 15, 2019), Rem. P.R. Doc. 1; *Letter from Pennington P.A. to Sec'y Commerce, re: Diamond Sawblades and Parts Thereof from the People's Republic of China (A-570-900): Lyke's Comments on Remand* (Oct. 24, 2019), Rem. P.R. Docs. 4–5 ("Lyke's Comments"); *Letter from Wiley Rein LLP to Sec'y Commerce, re: Diamond Sawblades and Parts Thereof from the People's Republic of China: Comments on (k)(2) Factors* (Oct. 24, 2019), Rem. P.R. Doc. 7 ("DSMC's Comments"); *Letter from Pennington P.A. to Sec'y Commerce, re: Diamond Sawblades and Parts Thereof from the People's Republic of China (A-570-900): Lyke's Rebuttal to Pet'rs' Remand Comments* (Oct. 31, 2019), Rem. P.R. Doc. 8 ("Lyke's Rebuttal Comments"); *Letter from Wiley Rein LLP to Sec'y Commerce, re: Diamond Sawblades and Parts Thereof from the People's Republic of China: Rebuttal Comments on (k)(2) Factors* (Oct. 31, 2019), Rem. P.R. Doc. 9 ("DSMC's Rebuttal Comments").

On February 3, 2020, Commerce issued its Remand Redetermination, addressing the issue of whether Lyke's cupwheels are within the scope of the Order by conducting a 19 C.F.R. § 351.225(k)(2) analysis.  After considering the five additional factors set forth in 19 C.F.R. § 351.225(k)(2), Commerce determined, once again, that Lyke's cupwheels are not within the scope of the Order.  *Remand Redetermination* 59.  On March 18, 2020, DSMC filed its public comments, maintaining that it was unnecessary for Commerce to proceed to an analysis under 19 C.F.R. § 351.225(k)(2) as "the scope language unambiguously covers cupwheels," and that if the language is ambiguous, then the 19 C.F.R. § 351.225(k)(1) factors are dispositive.  Pl. Diamond Sawblades Mfrs.'

Coal.'s Comments on Final Results of Redetermination Pursuant to Remand 4 (Mar. 18,

2020), ECF No. 35 ("DSMC's Remand Comments").  DSMC also states that Commerce's

determination on remand in regards to the (k)(2) factors is flawed and "inadequately

explained, unsupported by substantial evidence, are inappropriately divorced from the

scope language itself, and rest on an overly narrow interpretation of certain (k)(2)

factors."  *Id*.  On May 8, 2020, Commerce responded to DSMC's Remand Comments and

requested that the court sustain its Remand Redetermination.  Def.'s Resp. to

Comments on Remand Results 18 (May 8, 2020), ECF No. 38 ("Def.'s Reply").

The court now considers the Remand Redetermination.

## II.  Jurisdiction and Standard of Review

As in the prior opinion and order, the court exercises jurisdiction according to

section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), under which the

court reviews actions commenced under section 516A of the Tariff Act of 1930, as

amended, 19 U.S.C. § 1516a.

The court sustains Commerce's determinations unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence refers to "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion," *SKF USA, Inc. v.*

*United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. Nat'l*

*Labor Relations Bd.*, 305 U.S. 197, 229 (1938)), and under this standard, the court will

uphold a determination by Commerce provided that Commerce chooses from among

the range of possible and reasonable conclusions based on the record.  However,

although "Commerce is entitled to substantial deference with regard to its

interpretations of its own antidumping duty order," *King Supply Co., LLC v. United*

*States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (citation omitted) "[t]his broad deference is

not unlimited . . . 'Commerce cannot interpret an antidumping order so as to change the

scope of that order, nor can Commerce interpret an order in a manner contrary to its

terms.'"  *Id.* (quoting *Walgreen Co. v. United States*, 620 F.3d 1350, 1354 (Fed. Cir. 2010)).

### III. Discussion

The court sustains the Department's scope ruling.  Commerce has made the

determination that Lyke's cupwheels do not fall within the scope of the Order, and this

determination is supported by substantial evidence on the record.  The Department

correctly applied the regulatory framework of 19 C.F.R. § 351.225(k)(2) in conducting its

analysis and has complied with the court's directives in *Diamond Sawblades I.*

To determine whether a certain product is within the scope of an order,

Commerce first must consider the language of the order itself.  *See Arcelormittal Stainless*

*Belgium N.V. v. United States*, 694 F.3d 82, 87 (Fed. Cir. 2012).  If the scope language of

the order does not unambiguously cover or not cover the product in question,

Commerce then will take into account the descriptions of the merchandise contained in

sources identified in 19 C.F.R. § 351.225(k)(1) (commonly referred to as the (k)(1)

sources).  *See Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382–83 (Fed. Cir. 2005).

If the descriptions of the merchandise in the (k)(1) sources are not dispositive,

Commerce is required to consider five additional factors, enumerated in 19 C.F.R.

§ 351.225(k)(2).  These "(k)(2)" factors are: (i) the physical characteristics of the

merchandise; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the

product; (iv) the channels of trade in which the product is sold; and (v) the manner in

which the product is advertised and displayed.  19 C.F.R. § 351.225(k)(2).  In

considering these five factors, "it is well settled" that Commerce has discretion in how

to weigh and balance these factors.  *Meridian Prods., LLC v. United States*, 851 F.3d 1375,

1382 (Fed. Cir. 2017) (citing to *Novosteel SA v. United States*, 25 CIT 2, 15, 128 F. Supp. 2d

720, 732 (2001)) (internal quotation marks omitted).  However, when Commerce

conducts this inquiry and analysis according to the strictures of 19 C.F.R.

§ 351.225(k)(1)&(2), the Department's inquiry still must center on the scope language of

the antidumping duty order, for the Department's role in issuing a scope ruling is to

interpret, not modify, the scope language.  *Duferco Steel, Inc. v. United States*, 296 F.3d

1087, 1095 (Fed. Cir. 2002).  As a practical matter, this must include consideration of the

record information contained in the scope ruling request, which ordinarily will include,

*inter alia*, "[a] detailed description of the product, including its technical characteristics

and uses."  19 C.F.R. § 351.225(c)(1)(i).

In *Diamond Sawblades I*, the court held that the text of the scope of the Order did

not resolve the scope dispute in and of itself because the term "sawblade" was not

clearly defined and the scope was susceptible to interpretation.[3]  *Diamond Sawblades I*, 43

---

[3] The Order includes within its Scope:

[A]ll finished circular sawblades, whether slotted or not, with a working part
that is comprised of a diamond segment or segments, and parts thereof,
regardless of specification or size, except as specifically excluded below. Within
the scope of these orders are semifinished diamond sawblades, including
diamond sawblade cores and diamond sawblade segments. Diamond sawblade
cores are circular steel plates, whether or not attached to non-steel plates, with
slots. Diamond sawblade cores are manufactured principally, but not
exclusively, from alloy steel. A diamond sawblade segment consists of a mixture
of diamonds (whether natural or synthetic, and regardless of the quantity of
diamonds) and metal powders (including, but not limited to, iron, cobalt, nickel,
tungsten carbide) that are formed together into a solid shape (from generally, but
not limited to, a heating and pressing process).

*Diamond Sawblades and Parts Thereof From the People's Republic of China and the Republic of
Korea*, 74 Fed. Reg. 57,145, 57,145 (Int'l Trade Admin. Nov. 4, 2009) ("*Order*").  The
Order also contains several exclusions to this scope language:

Sawblades with diamonds directly attached to the core with a resin or
electroplated bond, which thereby do not contain a diamond segment, are not
included within the scope of the order. Diamond sawblades and/or sawblade
cores with a thickness of less than 0.025 inches, or with a thickness greater than
1.1 inches, are excluded from the scope of the order. Circular steel plates that
have a cutting edge of non- diamond material, such as external teeth that
protrude from the outer diameter of the plate, whether or not finished, are
excluded from the scope of the order. Diamond sawblade cores with a Rockwell
C hardness of less than 25 are excluded from the scope of the order. Diamond
sawblades and/or diamond segment(s) with diamonds that predominantly have
a mesh size number greater than 240 (such as 250 or 260) are excluded from the
scope of the order.

(continued . . .)

CIT at __, 405 F. Supp. 3d at 1352.  Thus, Commerce needed to take the "descriptions of

the merchandise contained in the petition, the initial investigation, and the

determinations of the Secretary (including prior scope determinations) and the

[International Trade] Commission" into account.  19 C.F.R. § 351.225(k)(1).  As the court

determined the (k)(1) sources were not dispositive in *Diamond Sawblades I*, 43 CIT at __,

405 F. Supp. 3d at 1358, Commerce was required to turn to the (k)(2) factors as well in

making its determination.

Upon analyzing the (k)(2) factors, Commerce determined that four of the five

factors supported the determination that Lyke's cupwheels are not covered by the scope

of the Order on diamond sawblades from China, and that the last factor, the channels of

trade in which the product is sold, is not dispositive to the analysis.  *Remand

Redetermination* 59.  In response, DSMC asserts that Commerce erred in its analysis and

its decision must be overturned.  DSMC's Remand Comments 4.  Therefore, the court

now addresses Commerce's analysis of each of these factors in its Remand

Redetermination to determine whether the Department's conclusions are reasonable

and supported by substantial evidence on the record.

(. . . continued)

---

*Id*.  The Order does not define the term "sawblade."

## A. Physical Characteristics of the Product

The first of the (k)(2) factors instructs Commerce to review the physical

characteristics of the product to determine whether the product, in this case cupwheels,

have the same physical characteristics as the product subject to the Order.  19 C.F.R.

§ 351.225(k)(2)(i).  After looking at the physical characteristics of the cupwheels,

Commerce determined that "cupwheels are physically distinguishable from diamond

sawblades."  *Remand Redetermination* 18.  In concluding this, Commerce relied on the

finding that a diamond sawblade must have an "attacking" or "cutting" edge to be

considered subject to the Order.  *Id.* at 19.  "[D]iamond segments must be attached to

the outer periphery of the core (creating an 'attacking edge,' or 'cutting edge') to be

within the scope of the [] *Order*."  *Id*.  These "attacking" or "cutting" edges can be one of

several types, as detailed in Commerce's questionnaires: "('Standard segment with

undercut,' 'Standard segment without undercut,' 'Turbo,' 'Continuous,' 'Other (please

describe),' or 'Not applicable (cores)')."[4]  *Id.* at 20.  Commerce found that while

diamond sawblades have a "cutting" edge or an "attacking" edge of one of the varieties

listed in the questionnaire, cupwheels, due to the fact the diamonds are attached to the

---

[4] Commerce also clarified that the "Not applicable (cores)" designation identified
in Commerce's antidumping duty questionnaire corresponds to the "Parts Thereof" of
the scope of the *Diamond Sawblades Order*, and therefore refers to an unfinished
diamond sawblade.  Final Results of Remand Redetermination (Feb. 3, 2020), Rem. P.R.
Doc. 15, ECF No. 30 ("*Remand Redetermination*").  Neither DSMC nor Lyke argue that
Lyke's cupwheels are unfinished products.

bottom of the cup, do not.  *Id.* at 18–19.  Commerce also found that in regards to the

"Other (please describe)" category, "there is no evidence that this option was intended

to encompass cupwheels, which are designed to grind flat surfaces and therefore do not

have a 'cutting edge' to identify."  *Id.* at 38.

The Department's finding that Lyke's cupwheels have diamonds attached to the

bottom of the cup and therefore do not have an "cutting" edge is supported by the

record evidence.  Lyke described its cupwheels, in its scope ruling request, as consisting

of a "steel plate that takes the shape of a cup or a hat – the center of the plate is concave

and the outside is flat.  Diamond segments are installed on the flat surface of the plate."

Lyke's Scope Request 3; *Remand Redetermination* 5.

DSMC does not disagree that Lyke's cupwheels have diamonds attached to the

bottom of the cup as opposed to an edge but questions the relevance of this physical

difference.  DSMC's Rebuttal Comments 11–12.  Although Commerce determined that

"diamond segments must be attached to the outer periphery of the core (creating an

"attacking edge," or "cutting edge") to be within the scope of the [] *Order*," *Remand*

*Redetermination* 19, DSMC argues that this insistence on a diamond sawblade having an

"attacking" edge to be within scope of the Order is a requirement engendered by

Commerce, and not found in the language of the Order itself, DSMC's Rebuttal

Comments 9–12.  DSMC therefore disagrees with Commerce's assertion that for a

product to be a diamond sawblade, it needs to have a "cutting" or "attacking" edge.

"In finding that cupwheels are so physically different from subject goods as to

constitute non-subject merchandise, Commerce begins from an unsound premise: that

subject goods are distinguished by having a 'cutting' or 'attacking' edge that results

from the placement of diamond segments on the outer periphery of the products."

*Id.* at 9.

Commerce directly addresses DSMC's argument: "Addressing DSMC's

argument that the scope of the *Order* is indifferent to the location of segment placement,

Commerce explained that statements from DSMC and the ITC throughout the

investigation indicate that a product that does not have an attacking edge that

penetrates the material is not subject merchandise."  Def.'s Reply 9–10; *see also Remand*

*Redetermination* 39 (citing *Order*, 74 Fed. Reg. at 57,146 n.9; *Final Determination of Sales at*

*Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances:*

*Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg.

29,303, 29,305 (Dep't of Commerce May 22, 2006) (final determ.); Diamond Products and

Parts Thereof from China and Korea: Investigation Nos. 731-TA-1092 and 1093 (Final) 3,

USITC Publication 3862 (July 2006) ("ITC Report")).  As further support for this

conclusion, Commerce cites language from the Order itself, examining the Order's

exclusions, which include "[c]ircular steel plates that have a cutting edge of non-

diamond material, such as external teeth that protrude from the outer diameter of the

plate, whether or not finished." *Order*, 74 Fed. Reg. at 57,145; Def.'s Reply 10; *Remand*

*Redetermination* 39.  As Commerce notes, this scope exclusion language lends support to

Commerce's reading in two ways:

> First, it supports Commerce's reading that the product must have a
> "cutting edge" to be considered a sawblade. If the scope was intended to
> cover merchandise without a cutting edge, the exclusionary language
> might have instead addressed circular steel plates with a "cutting
> element" or "working part" of non-diamond material. Second, it supports
> Commerce's interpretation that a cutting edge is formed by a cutting
> element on the outer diameter of the core, rather than on the flat surface.
> Therefore, this language supports Commerce's conclusion that, because
> Lyke's cupwheels do not have diamond segments attached to the outer
> diameter of the cores, they do not have a cutting edge and are physically
> distinguishable from diamond sawblades.

Def.'s Reply 10.  Besides relying on the scope language itself, Commerce explains that

the initial questionnaires it sent respondents also support the finding that a product

must have a "cutting" edge to be within the scope of the Order.  Commerce had

requested that respondents identify the type of "cutting edge" their merchandise had

"for model matching purposes" and "Lyke's cupwheels do not have a cutting edge at

all because the diamond segments in cupwheels are attached to the bottom of the cup,

not the rim."  *Id.* at 9; *see also Remand Redetermination* 19.

    Commerce also concluded that there were other physical differences between

cupwheels and diamond sawblades.  *Remand Redetermination* 20.  "For example, we find

that with respect to physical form, Commerce's questionnaire provides participating

respondents three options to identify the type of physical form of their merchandise,

'finished diamond sawblades,' 'cores,' or 'segment.'  Lyke's cupwheels do not have any of the physical forms listed in Commerce's questionnaire."  *Id.* at 20.

DSMC disagrees with Commerce's determination that cupwheels are physically distinguishable from diamond sawblades.  DSMC's Remand Comments 8–12.  DSMC highlights that diamond sawblades are "physically distinguished from all other types of sawblades by the presence of diamonds in the working part of the blade," which work, not by cutting materials, but by "milling" or "grinding" them.   DSMC's Rebuttal Comments 5.  According to DSMC, as cupwheels have diamonds on the working part of the blade and they also "cut" through materials by grinding them, they meet the description provided in the Petition of subject merchandise.  *Id.*; *see also Remand Redetermination* 6.  Furthermore, DSMC argues that there are additional physical similarities, such as "[b]oth diamond sawblades and cupwheels consist of a circular steel core and diamond segments that are attached to the core" and "[b]oth diamond sawblades and cup wheels also have a hole in the center of the core to allow them to be attached to a grinding tool."  DSMC Rebuttal Comments 4–5.  DSMC asserts further that, similarly, the cores for cupwheels are typically convex or concave, and therefore there are no differences in the diamond segments used for diamond sawblades and cupwheels.  *Id.* at 5; *Remand Redetermination* 7.

Commerce acknowledges these arguments from DSMC but indicates that it does not find them persuasive as these comparisons between cupwheels and diamond

sawblades are "overly generalized." *Remand Redetermination* 20. For instance, under

DSMC's analysis of physical characteristic similarities, a diamond core drill also would

be covered by the Order because it consists of a core and diamond segments and has a

hole in the center of the core for attaching the core drill bit to a grinding tool, despite the

fact that Commerce and the ITC already determined that diamond core drill bits were

non-subject merchandise. *Id.* at 21.

Taken altogether, Commerce emphasizes that the location of the diamonds on

the product is strongly determinative of whether that product is within the scope of the

Order, and that cupwheels and diamond sawblades were physically distinguishable

largely based on this difference. *Id.* at 21. Commerce's decision to rely on the location

of the diamonds within the product, and the Department's finding that to constitute a

diamond sawblade within the scope of the Order the product must have an "attacking"

or "cutting" edge is not unreasonable, despite plaintiff's protestations to the contrary.

This finding is supported by the record read as a whole, including Commerce's

questionnaires, the language in the Petition, the investigation, the ITC report, and the

scope language of the Order. *Id.* at 35–40.

Contrary to what DSMC argues ("[i]ndeed, the Court already found, in the

decision remanding this action, that the (k)(1) materials do not support Commerce's

conclusion that cupwheels are out-of-scope products by reason of edge type or segment

placement"), DSMC's Remand Comments 12, the court did not instruct Commerce that

the (k)(1) materials did not support Commerce's conclusions regarding what constitutes

a diamond sawblade.  Instead, the court found that the (k)(1) analysis, without

additional evidence coming from the (k)(2) factors, was not sufficient to uphold the

Department's determination.  "Commerce has failed to demonstrate that Lyke's

cupwheels are not within the scope of the order based *solely* on the three sources

available under 19 C.F.R. § 351.225(k)(1)."  *Diamond Sawblades I*, 43 CIT at __, 405

F. Supp. 3d at 1353.  The court did not instruct Commerce to ignore the record as a

whole or discount evidence in the language of the Order itself or from (k)(1) sources

when doing its (k)(2) analysis.

### B. Expectations of the Ultimate Purchaser and the Manner in Which the Product is Advertised and Displayed

Commerce analyzes the second and fifth (k)(2) factors, the "expectations of the

ultimate purchasers" and "the manner in which the product is advertised and

displayed" in tandem.  *See* 19 C.F.R. § 351.225(k)(2)(ii), (v).  Commerce determined that

the record regarding these factors supports a finding that cupwheels and diamond

sawblades are advertised and displayed differently, and that the expectations of the

ultimate purchaser differ with each product.  *Remand Redetermination* 21–25, 46–54.

Commerce reviewed evidence put on the record both by Lyke and by DSMC

regarding the expectations of the ultimate purchaser.  Commerce analyzed consumer

reviews posted to websites, website advertisements and product descriptions, and an

affidavit provided by DSMC.  *Id.* at 48–53.  Commerce compared the reviews posted by

consumers who purchased diamond sawblades with reviews posted by consumers who

purchased grinding cupwheels and concluded that the consumers have different

expectations of each product.  *Id.* at 49–50.  For instance, Commerce found that the

websites and advertisements showed that diamond sawblades are advertised as cutting

through hard material and that cupwheels are advertised as tools designed to grind,

level or smooth surfaces of hard material.  The expectations of the ultimate purchaser

similarly differ.  "Commerce also observed that the 'related searches,' 'customers also

viewed,' and 'related items' features of these websites supported finding that diamond

sawblades and cupwheels are distinct products."  Def.'s Reply 14; *Remand*

*Redetermination* 10.  In fact, "[n]one of the advertisements placed on the record by

parties identify 'grinding cupwheels' as a diamond sawblade."  *Remand Redetermination*

50–51.  Based on evidence such as this, Commerce permissibly found that the

expectation of the end purchaser was different for each product.  *Id.* at 23–24.

DSMC's central argument is that, "in reaching this determination, Commerce has

gone beyond its proper role of interpreting the current scope language, and has strayed

into the realm of amendment." DSMC's Remand Comments 12.  DSMC argues that

Commerce is making an irrelevant distinction between grinding or polishing material

as opposed to cutting it, as the scope language of the Order "does not define subject

goods based on spin direction and location of segment placement (or whether these

result in a 'cutting' or 'grinding' action)."  *Id.* at 14–15.  Additionally, DSMC argues that

diamond sawblades and cupwheels are both advertised as being used for cutting,

creating that consumer expectation.  DSMC's Comments 5–7, DSMC's Rebuttal

Comments 6–7; DSMC's Remand Comments 12–13.  According to DSMC, both

diamond sawblades and cupwheels are expected to grind or abrade material by way of

contact between the diamond segments and the material at issue, and that purchasers

expect that the diamond sawblades and cupwheels both will be able to maintain its

strength during the grinding and abrading process.  DSMC's Rebuttal Comments 5.

Commerce addresses DSMC's evidence, noting that DSMC put on the record a

printout of a website (U.S. Diamond) where it describes diamond sawblades and its

uses.  *Remand Redetermination* 22–23; DSMC's Comments Ex. 2.  The website excerpt

reads: "Are you looking to *cut* block?  If so, you'll want a diamond blade. . . Diamond

saw blades have diamonds *fixed on their edges* which allow for *cutting* hard or abrasive

materials.  There are many types of diamond blades, and they have many uses,

including cutting stone, concrete, asphalt, bricks and many others."  DSMC's

Comments Ex. 2 (emphasis added).  The same website states that cup grinding wheels

are used for "*grinding and polishing*."  *Id.* (emphasis added).  Lastly, the website also lists

diamond sawblades and cupwheels separately in its search function, which Commerce

took as support for the finding that they are considered distinct, non-fungible products.

*Remand Redetermination* 23.

DSMC argues that the Home Depot website describes cupwheels as being used for "cutting," an argument that Commerce found took the word "cutting" out of context. For instance, Home Depot's website stated that "the 4-inch Double Row Diamond Cup Wheel" is engineered "for maximum cutting performance," which DSMC argues supports the determination that the ultimate purchaser's expectation of cupwheels is to cut into materials. DSMC's Rebuttal Comments 6, Ex. 2; *Remand Redetermination* 11. However, Commerce, in reviewing the full description of the product in the Home Depot website, noted that the description of the cupwheel includes additional language, such as the cupwheels are "engineered with top-grade industrial diamond for maximum cutting performance and superior grinding life" and that the cupwheels could be used for a range of projects including "shaping and polishing [] concrete surfaces and floors, to fast aggressive concrete grinding or leveling and coating removal." *Remand Redetermination* 23. The description also noted that the cupwheels have "faster grinding and longer life than standard abrasive grinding wheels," indicating that this particular cupwheel was being advertised as superior to other "abrasive grinding wheels," and not being advertised in relation to its ability to function as a diamond sawblade. *Id.* at 24. Taken all together, Commerce made the reasonable finding that the word "cutting" in the context of the advertisement meant that the cupwheels were being advertised as designed to cut materials in a parallel fashion, grinding or polishing the surface of a material, rather than cutting into a

material in a perpendicular fashion as one would expect from a diamond sawblade.

*Remand Redetermination* 24.

Lastly, Commerce considers the affidavit submitted by DSMC from an official at

a company that manufactures and sells diamond sawblades and cupwheels which

claims that "all diamond sawblades and cup wheels are expected to grind or abrade

materials by pressing the diamond segments against said materials." DSMC's

Comments Ex. 1.  Commerce discounts this affidavit in light of the other evidence on

the record, *Remand Redetermination* 22–23, stating that Commerce "considered this

second-hand explanation of the expectations of customers to be less compelling

evidence of consumer expectations than the direct reviews posted from consumers

themselves," Def.'s Reply 14.

Commerce ultimately found that the consumer reviews from websites like Home

Depot and Lowes, as well as the advertisement printouts from the same, supported

Commerce's finding that the expectations of the ultimate purchasers are different for

cupwheels and diamond sawblades, and that the manner in which these products are

advertised and displayed also differ by the type of product.  *Remand Redetermination* 24–

25.  "That is, based on the consumer reviews and the advertisements of both diamond

sawblades and cupwheels, we find that consumers would, for example, purchase a

diamond sawblade if they expected to use the tool to cut a block of concrete from a

driveway (diamond sawblades 'allow for cutting hard or abrasive materials'), and they

would purchase a cupwheel if they expected to "grind and polish hard or abrasive

materials." *Id.* at 25.

Because Commerce reviewed the record evidence, acknowledged and addressed

both DSMC's and Lyke's comments, and came to a conclusion supported by the record,

it was not unreasonable for Commerce to conclude that diamond sawblades and

cupwheels are advertised differently and that ultimate purchasers have different

expectations for each product.

### C. Ultimate Use of the Product

With respect to the ultimate use of the product, 19 C.F.R. § 351.225(k)(2)(iii),

Commerce found that diamond sawblades were used for cutting hard materials while

cupwheels were used for grinding, leveling, or polishing hard materials. *Remand*

*Redetermination* 25. In coming to the conclusion that the products were ultimately used

differently, Commerce partly relied on the U.S. Diamond website placed onto the

record by DSMC, which indicated that diamond sawblades were used to cut block,

while another source provided by DSMC, a printout from Wikipedia describing

cupwheels, noted that they were used for grinding concrete and stone or could be used

to remove paints or other surface coatings. *Id.* at 26. Commerce also reviewed the end

use description used by the ITC stating that diamond sawblades end use was to cut

concrete, stone, and other hard materials. *Diamond Sawblades and Parts Thereof from*

*China and Korea, Prehearing Report to the Commission on Investigation Nos. 731-TA-1092-*

*1093 (Final)* (May 2, 2006).  Therefore Commerce found that "based on the information

on the scope record, the ITC's description of the end use of the products, and

Commerce's experience in conducting numerous administrative reviews in this

proceeding, we find that the ultimate use of Lyke's cupwheel is not the same as the

ultimate use of diamond sawblades." *Remand Redetermination* 27.

     DSMC argues that diamond sawblades "do not actually cut materials, rather,

diamond sawblades mill (i.e., grind) them."  DSMC's Rebuttal Comments 5; *see also*

DSMC's Remand Comments 19–22.  According to DSMC, this is also how cupwheels

are used, and that to the extent diamond sawblades are used for cutting, so too are

cupwheels.  DSMC's Rebuttal Comments 8.  "[B]oth diamond sawblades and

cupwheels are generally used to grind or abrade materials (*i.e.*, cut) through contacting

the diamond segments with the material at issue.  Thus, according to DSMC, the

ultimate use of diamond sawblades and cupwheels is the same." *Remand*

*Redetermination* 14 (footnote omitted).  Commerce agrees with DSMC that both diamond

sawblades and cupwheels, by virtue of their diamonds, do not, in a technical sense, cut

materials but instead grind them, but that "the manner in which diamond sawblades

cut hard or abrasive materials is by grinding the material in a perpendicular manner at

one specific point of the hard or abrasive material, such as how you would use a general

purpose saw blade or typical saw.  However, based on the information provided on the

record, the ultimate use of a grinding cupwheel is to grind the material in a parallel

manner similar to what one would expect from a sandpaper power tool." *Remand Redetermination* 25.  Thus, despite both tools working by "grinding" the hard material, one "cuts" into the material perpendicularly, and the other "polishes" the hard material in parallel.  This interpretation is supported by the U.S. Diamond website and the Wikipedia pages put on the record by DSMC.  As Commerce's conclusion is supported by the evidence on the record and it is reasonable to determine that cupwheels are used to polish material while diamond sawblades are used to cut into material, the court finds that Commerce appropriately analyzed this factor to find that cupwheels were ultimately used differently than cupwheels.

### D.  Channels of Trade in Which the Product is Sold

Commerce agrees with DSMC that both diamond sawblades and cupwheels are sold within similar channels of trade.  *See* 19 C.F.R. § 351.225(k)(2)(iv); *Remand Redetermination* 27, 59.  Commerce notes that the record evidence shows that both products are sold to distributors (retail outlets such as Home Depot and Lowes) and to end-users.  Thus, this (k)(2) factor, unlike the other four, supports a finding that diamond sawblades and cupwheels should both be products within the scope of the Order.  However, Commerce permissibly found that the other four factors weighed in favor of finding that Lyke's cupwheels are not covered by the scope of the Order.  Commerce concluded that "[a]lthough we find that the channels of trade are relatively the same for both products, we find that it is not indicative or dispositive that they are

subject to the [] *Order* for the reasons outlined above." *Remand Redetermination* 28.  This was appropriate, as it is it is well settled that Commerce has discretion in how to weigh and balance (k)(2) factors, *Meridian*, 851 F.3d at 1382, and the court finds that it is not unreasonable of Commerce in this case to allocate more weight to four (k)(2) factors than to the one.

### IV.  Conclusion

As directed to in *Diamond Sawblades I*, Commerce undertook further evaluation of whether cupwheels are within the scope of the antidumping duty order on diamond sawblades from China, pursuant to the factors set forth in 19 C.F.R. § 351.225(k)(2).  The Department's decision that Lyke's cupwheels are not within the scope of the Order is supported by substantial evidence, is a reasonable interpretation based on the evidence entered in this record, and was determined in accordance with law.  In reviewing Commerce's analysis under 19 C.F.R. § 351.225(k)(2), the court will not "substitute [its] judgment for that of Commerce," *see Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999), but instead will uphold Commerce's determination provided it chooses from among the range of possible reasonable conclusions based on the record.  *See SKF*, 537 F.3d at 1378.  Here, Commerce has done so.  Accordingly, the court sustains the Department's determinations in full.

Judgment will enter accordingly.

 

 

 

                        /s/ Richard W. Goldberg      
                        Richard W. Goldberg
                        Senior Judge

Dated: October 7, 2021
New York, New York